# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ANTHONY J. SPATARO,

        **Plaintiff,**

v.                                         **CIV 08-0274 JCH/LAM**

DEPUY ORTHOPAEDICS, INC., et al.,

        **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

## PROPOSED FINDINGS

1.      **THIS MATTER** is before the Court on ***Plaintiff's Motion to Remand*** (*Doc. 5*), filed on March 24, 2008.  The Court has considered the parties' submissions, the record of this case and relevant law.[2]  For the reasons set forth below, the Court recommends that Plaintiff Anthony Spataro's motion to remand be **GRANTED** and this case be remanded to the Second Judicial District Court of New Mexico.

---

[1] **Within ten (10) days after a party is served with a copy of these Proposed Findings and Recommended Disposition, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommended disposition.  A party must file any objections with the Clerk of the United States District Court for the District of New Mexico within the ten (10) day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.  Pursuant to Fed. R. Civ. P. 72(b)(2), a party may respond to another party's objections within ten (10) days after being served with a copy of the objections.**

[2] The parties' submissions on the motion are: Plaintiff's ***Memorandum in Support of Plaintiff's Motion to Remand*** (*Doc. 6*); ***Defendants DePuy Orthopaedics, Inc. and Gina Dillard's Response to Plaintiff's Motion to Remand*** (*Doc. 12*); Plaintiff's ***Reply in Support of Plaintiff's Motion to Remand*** (*Doc. 13*); and Plaintiff's ***Notice of Completion of Briefing*** (*Doc. 14*).  The Court notes that Defendant Randy Arnold has not filed a response to Plaintiff's motion to remand and has not joined in the response filed by Defendants DePuy Orthopaedics, Inc. and Gina Dillard.  Arnold's failure to respond to the motion constitutes consent to grant the motion as to him pursuant to D.N.M.LR-Civ. 7.1(b).

### *Factual and Procedural Background*

2.      Spataro originally filed suit in the Second Judicial District Court of New Mexico, on January 11, 2008, against Defendants DePuy Orthopaedics, Inc. (hereinafter, "DePuy"), Randy Arnold and Gina Dillard.  *See* **Notice of Removal** (*Doc. 1*), Exhibit A (*Doc . 1-3*) at pages 3 - 9 in the Court's CM-ECF electronic docketing system.[3]  Spataro filed a first amended complaint in the state court action on February 11, 2008, against the same defendants.  *See* **Defendant's Notice of Filing State Court Record** (*Doc. 10*), Exhibit A (*Doc. 10-2*) at pages 9 - 15.[4]  Spataro's claims in the first amended complaint arise out of surgery he alleges he underwent in August of 2005, in Albuquerque, New Mexico, during which he was fitted with a prosthetic knee joint.  *Id.* at ¶ 5. Spataro alleges that the prosthetic knee joint was designed, manufactured and marketed by DePuy to be supplied to patients and physicians in the United States, including New Mexico, and it was defective.  *Id.*  Spataro alleges that the prosthetic knee joint failed in his body and his first amended complaint includes various claims for negligence, various claims for strict products liability, and claims for breach of express and implied warranties.  *Id.* at ¶ 8 and pages 3 - 7.

3.      Defendant DePuy was served with a copy of Spataro's first amended complaint and a related summons on February 13, 2008, by service on its agent CT Corporation.  *Id.* at pages 16 - 18.  Defendant Dillard was served with a copy of the first amended complaint and a related summons on or about February 18, 2008.  *Id.* at pages 19 - 22.

---

[3]Unless otherwise noted, all pages referenced herein are to the Court's CM-ECF electronic docketing system.

[4]Defendant Gina Dillard was referred to as "Gina," with no last name, in both the original complaint and the first amended complaint filed by Spataro in state court.  *See* **Notice of Removal** (*Doc. 1*), Exhibit A (*Doc . 1-3*) at page 1; **Defendant's Notice of Filing State Court Record** (*Doc. 10*), Exhibit A (*Doc. 10-2*) at page 9.

4.      The citizenship of the parties is not in dispute.  Spataro resides in New Mexico and is a citizen of New Mexico.  *Id.* at page 9, ¶ 1; ***Notice of Removal*** (*Doc. 1*) at ¶ 3.  Defendant DePuy is an Indiana corporation with its principal place of business in Warsaw, Indiana, and is a citizen of Indiana.  ***See Defendant's Notice of Filing State Court Record*** (*Doc. 10*), Exhibit A (*Doc. 10-2*) at page 9, ¶ 2; ***Notice of Removal*** (*Doc. 1*) at ¶ 3; 28 U.S.C. § 1332(c)(1) (for purposes of diversity jurisdiction, a corporation is a citizen of its State of incorporation and of the State where it has its principal place of business).  Defendant Randy Arnold resides in New Mexico and is a citizen of New Mexico.  ***See Defendant's Notice of Filing State Court Record*** (*Doc. 10*), Exhibit A (*Doc. 10-2*) at page 9, ¶ 3; ***Defendant Randy Arnold's Verified Answer to First Amended Complaint*** (*Doc. 16*) at ¶ 3.  Defendant Gina Dillard resides in New Mexico and is a citizen of New Mexico.  ***See Defendant's Notice of Filing State Court Record*** (*Doc. 10*), Exhibit A (*Doc. 10-2*) at page 9, ¶ 4; ***Defendant Gina Dillard's Answer to First Amended Complaint*** (*Doc. 9*) at ¶ 4.

5.      On March 14, 2008, Defendant DePuy removed the case to this Court, pursuant to 28 U.S.C. § 1446, asserting federal subject matter jurisdiction under 28 U.S.C. § 1332(a) based on diversity of citizenship.  *See **Notice of Removal*** (*Doc. 1*) at pages 1 and 2, ¶ 5.  In its notice of removal, DePuy alleges that: (a) complete diversity of citizenship exists between Spataro and DePuy because Spataro fraudulently joined Arnold and Dillard as defendants, making DePuy the only properly named defendant; and (b) the amount in controversy exceeds $75,000 and is, therefore, sufficient to support diversity jurisdiction.  *Id.* at ¶¶ 3, 5, 15.[5]

---

[5]Although DePuy was the only defendant to file a notice of removal, Dillard and Arnold indicated their consent to removal in sworn declarations filed with DePuy's notice of removal.  *See **Notice of Removal*** (*Doc. 1*), Exhibit B (*Doc. 1-4*) at ¶ 8, and Exhibit C (*Doc. 1-5*) at ¶ 6.  Thus, all defendants have consented to the removal of this case.

6. Defendant Arnold was not served in the state court proceeding. After the case was removed by DePuy, a summons was issued for Arnold by this Court on April 22, 2008, and Arnold filed an answer to Spataro's first amended complaint on June 10, 2008. *See* docket entry for issuance of summons to Arnold on April 22, 2008, and ***Defendant Randy Arnold's Verified Answer to First Amended Complaint*** (*Doc. 16*).

7. On March 24, 2008, Spataro filed his motion to remand asking the Court to remand this case to state court. *See **Plaintiff's Motion to Remand*** (*Doc. 5*). Spataro makes two arguments in connection with his motion. First, he argues that Defendants have failed to establish the fraudulent joinder of Defendants Arnold and Dillard and, therefore, complete diversity of citizenship does not exist between the parties. *Id.* at ¶ 1. Second, he argues that Defendants have failed to establish that the requisite amount in controversy is satisfied for diversity jurisdiction. *Id.* at ¶ 2. Therefore, Spataro contends that this case should be remanded to state court for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). In their response to the motion to remand, Defendants DePuy and Dillard argue that Arnold and Dillard were fraudulently joined as defendants and, therefore, their citizenship should be disregarded for purposes of determining diversity jurisdiction. *See **Defendants DePuy Orthopaedics, Inc. and Gina Dillard's Response to Plaintiff's Motion to Remand*** (*Doc. 12*). Additionally, DePuy and Dillard argue that the amount in controversy requirement for diversity jurisdiction is satisfied in this case. *Id.* DePuy attached sworn affidavits of Dillard and Arnold to its notice of removal. *See **Notice of Removal*** (*Doc. 1*), Exhibits B (*Doc. 1-4*) and C (*Doc. 1-5*). DePuy also attached the sworn affidavit

4

of Lester Pierce, its customer service manager, to its notice of removal.  *Id.*, Exhibit D (*Doc. 1-6*).

### Fraudulent Joinder and Diversity Jurisdiction

8.      A federal district court has diversity jurisdiction under 28 U.S.C. § 1332(a) if (a) the parties are citizens of different states, and (b) the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  *See Johnson v. Rodrigues*, 226 F.3d 1103, 1107 (10th Cir. 2000).  Diversity between the parties must be complete.  *See Radil v. Sanborn Western Camps, Inc.*, 384 F.3d 1220, 1225 (10th Cir. 2004).  If a civil case filed in state court satisfies the requirements for diversity jurisdiction, a defendant may generally remove the case "to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  Once a case is removed, a plaintiff may attack removal by filing a motion to remand the case back to state court.  *See Huffman v. Saul Holdings Ltd. P'shp*, 194 F.3d 1072, 1076 (10th Cir. 1999) (citing *Caterpillar v. Lewis*, 519 U.S. 61, 69 (1996)); 28 U.S.C. § 1447(c).

9.      "It is well-established that statutes conferring jurisdiction upon the federal courts, and particularly removal statutes, are to be narrowly construed in light of our constitutional role as limited tribunals."  *Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1094-95 (10th Cir. 2005) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941) and *United States ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1280 (10th Cir. 2001)).  A presumption exists against removal jurisdiction, where a case was originally filed in state district court.  *Martin v. Franklin Capital Corp.*, 251 F.3d 1284, 1289 (10th Cir. 2001) (citing *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995)).  "[A]ll doubts are to be resolved against removal."

*Fajen v. Found. Reserve Ins. Co., Inc.*, 683 F.2d 331, 333 (10th Cir. 1982).  The removing party bears the burden of establishing that the requirements for diversity jurisdiction are met.  *See Martin v. Franklin Capital Corp.*, 251 F.3d 1284, 1290 (10th Cir. 2001).

10.     Fraudulent  joinder of a non-diverse defendant creates an exception to the requirement of complete diversity and allows the Court to disregard the citizenship of the non-diverse party and retain jurisdiction without regard to his or her citizenship.[6]  However, DePuy and Dillard bear a heavy burden of proving that Defendants Arnold and Dillard have been fraudulently joined.  "To justify removal based on diversity jurisdiction, a defendant must plead a claim of fraudulent joinder with particularity and prove the claim with certainty." *Couch v. Astec Industries, Inc.*, 71 F. Supp. 2d 1145, 1146-47 (D.N.M. 1999) (Baldock, J., sitting by designation) (citing *McLeod v. Cities Service Gas Co.*, 233 F.2d 242, 246 (10th Cir. 1956)).

11.     Although a federal court does not usually examine issues of liability on a motion to remand, "it is well settled that upon allegations of fraudulent joinder designed to prevent removal, federal courts may look beyond the pleadings to determine if the joinder, although fair on its face, is a sham or fraudulent device to prevent removal."  *Smoot v. Chicago, Rock Island and Pacific R.R. Co.*, 378 F.2d 879, 881-82 (10th Cir. 1967) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921), and *Leonard v. St. Joseph Lead Co.*, 75 F.2d 390, 394 (8th Cir. 1935)).  *See also Dodd v. Fawcett Publications, Inc.*, 329 F. 2d 82, 85 (10th Cir. 1964) ("But upon specific allegations of fraudulent joinder the court may pierce the pleadings, . . . consider the entire record, and determine the basis of joinder by any means available[.]") (citations omitted).  "This does not

_____

[6]Spataro's motives are immaterial in analyzing fraudulent joinder.  *See Cooper v. Zimmer Holdings, Inc.*, 320 F. Supp. 2d 1154, 1157 (D. Kan. 2004) ("Fraudulent joinder is a term of art[;] it does not reflect on the integrity of plaintiff or counsel, but rather exists regardless of the plaintiff's motives when the circumstances do not offer any other justifiable reason for joining the defendant").

mean that the federal court will pre-try, as a matter of course, doubtful issues of fact to determine removability; the issue must be capable of summary determination and be proven with complete certainty." *Id.* (citation omitted).

12.     One type of fraudulent joinder occurs "where a plaintiff cannot plead a cause of action against the non-diverse defendant . . . ." *Couch v. Astec Indus., Inc.*, 71 F. Supp. 2d at 1147 (citing *Rogers v. Hartford Acc. & Indem. Co.*, 133 F.3d 309, 315 (5th Cir. 1998)).  This is the type of alleged fraudulent joinder at issue in this case.  To prove this type of fraudulent joinder, a removing party

> must demonstrate that there is no possibility that [plaintiff] would be able to establish a cause of action against [the joined party] in state court.  In evaluating fraudulent joinder claims, [judges] must initially resolve all disputed questions of fact and all ambiguities in the controlling state law in favor of the non-removing party.  [Judges] are then to determine whether that party has any possibility of recovery against the party whose joinder is questioned.

*Hart v. Bayer Corp.*, 199 F.3d 239, 246 (5th Cir. 2000) (quotation omitted) (quoted in *Montano v. Allstate Indem.*, No. 99-2225, 211 F. 3d 1278, 2000 WL 525592 (10th Cir. April 14, 2000) (unpublished) at *1-2.).[7]  "This standard is more exacting than that for dismissing a claim under Fed. R. Civ. P. 12(b)(6); indeed, the latter entails the kind of merits determination that, absent fraudulent joinder, should be left to the state court where the action was commenced." *Montano v. Allstate Indem.*, 2000 WL 525592 at *2.  Moreover, "[a] claim which can be dismissed only after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be disregarded for purposes of diversity jurisdiction."  *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 853 (3d Cir. 1992) (quoted in *Montano v. Allstate Indem.*, 2000 WL 525592 at *2).

---

[7]*Montano* is cited for its persuasive value pursuant to 10th Cir. R. 32.1(A).

13.     A plaintiff need not ultimately succeed on a claim against a non-diverse defendant to defeat removal jurisdiction, but "need only demonstrate the possibility of the right to relief." *Couch v. Astec Indus., Inc.*, 71 F. Supp. 2d at 1147 (citing *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 233 (4th Cir. 1993)).  If the removing defendant fails to establish a basis for diversity jurisdiction, the Court must remand the case to state court without ruling further on the matter.  *See Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005).

### *Defendant Gina Dillard*

14.     DePuy and Dillard argue that Spataro fraudulently joined Dillard, who is a citizen of New Mexico, for the purpose of defeating diversity jurisdiction.  *See **Defendants DePuy Orthopaedics, Inc. and Gina Dillard's Response to Plaintiff's Motion to Remand** (Doc. 12)*).  Thus, applying the test cited in *Montano v. Allstate Indem.*, 2000 WL 525592 at *1-2, the Court must determine whether there is no possibility that Spataro could establish a cause of action against Dillard in state court, resolving all disputed questions of fact and all ambiguities in the controlling law in favor of Spataro.  Remand is required if any one of the claims that Spataro asserts against Dillard is possibly viable.  *Id.* at *2.

15.     Spataro asserts two claims of strict products liability against Dillard in his first amended complaint.  *See **Defendant's Notice of Filing State Court Record** (Doc. 10)*), Exhibit A (*Doc. 10-2*) at pages 13 and 14, ¶¶ 30-39.  In his first claim, Spataro alleges that Dillard was an employee or independent contractor of DePuy who distributed and/or supplied DePuy medical devices.  *Id.* at ¶ 31.  Spataro alleges that the defective condition of the DePuy prosthesis implanted in his knee, created by DePuy's failure to manufacture, inspect, market, package and/or distribute the prosthesis in accordance with Food and Drug Administration (hereinafter, "FDA") specifications

and requirements, created an unreasonable risk of injury when the device was used for its intended purpose. *Id.* at ¶ 32. Spataro alleges that his injuries were caused by the defective condition of the DePuy prosthesis and that Dillard is strictly liable for Spataro's damages under the Restatement (Second) of Torts § 402A. *Id.* at ¶¶ 33-34. In his second claim, Spataro alleges that Dillard is strictly liable to Spataro for the allegedly defective prosthesis under the doctrine of res ipsa loquitur. *Id.* at ¶¶ 35-39. Spataro alleges that the DePuy prosthesis failed in his body because it deviated from FDA-approved specifications, *id.* at ¶ 36, and, more specifically, "because the polyethylene portion of the patella knee prosthesis separated from the metal component," *id.* at ¶ 8. Spataro also alleges, upon information and belief, that Dillard was present before, during and/or after his surgery in August of 2005, and that she and/or Arnold supplied the prosthesis to the operating surgeon. *Id.* at ¶ 6.

16.    In her sworn affidavit, Dillard admits that she is, "and was in August of 2005 an independent contractor sales representative in the Albuquerque, New Mexico area for medical device products manufactured, sold, distributed and supplied by DePuy, including knee prostheses. *See* **Notice of Removal** (*Doc. 1*), Exhibit B (*Doc. 1-4*) at ¶ 4. Although Dillard states that she has no specific recollection as to whether she was present during surgery on Spataro, she does not rule it out and she acknowledges that she may have delivered, to the hospital where the surgery was performed, the DePuy implant products selected and requested by the physician doing the surgery and ordered by the hospital. *Id.* Dillard states that she did not, and does not, purchase from DePuy or acquire title to any prosthetic implant products. *Id.* Dillard states that before a surgery like Spataro's, she would deliver to the hospital in a large plastic tub different sizes of the DePuy implant product selected and requested by the physician, and ordered by the hospital, since the size of the

product required is not determined until during the surgery.  *Id.* at ¶ 5.  She states that she delivered each DePuy implant product to the hospital in the same sterile-sealed condition in which she received it from DePuy for purposes of making the delivery.  *Id.*  She further states that the DePuy products would stay in the plastic tub until the physician requested a specific size of the implant product for the patient, with the size determined during surgery based on surgical preparation of the area for implant.  *Id.* at ¶ 6.  She states that when the surgeon designated the size, she would obtain from the plastic tub the package containing that size, with the sterile-sealed packaging intact, remove a product identification label for her file, and deliver the package to operating room staff members or physician assistants.  *Id.*  She states that the product would remain in its sterile-sealed packaging until the packaging was removed by the operating staff members or physician assistants prior to being implanted by the surgeon.  *Id.*  After delivery of the DePuy product, she states that she would remove the tub with the remaining products.  *Id.*  She states that she followed this procedure in the surgeries she has attended as a DePuy sales representative and that she followed this procedure in Spataro's surgery in August of 2005, if she was in attendance.  *Id.*[8]

17.    In his sworn affidavit, DePuy's customer service manager, Lester Pierce, states that DePuy's independent contractor sales representatives assist in the physical delivery of DePuy medical device products selected by a physician and purchased by hospitals from DePuy, but those independent sales representatives do not design or manufacture DePuy orthopaedic implant products or purchase such products from DePuy and then sell, distribute or supply them to doctors, hospitals or others.  *See* **Notice of Removal** (*Doc. 1*), Exhibit D (*Doc. 1-6*) at ¶ 6.

---

[8]In his sworn affidavit, discussed later herein, Defendant Arnold states that he was present during at least portions of Spataro's surgery and that Dillard was also present during portions of Spataro's surgery.  *See* **Notice of Removal** (*Doc. 1*), Exhibit C (*Doc. 1-5*) at ¶ 5.

18.      DePuy and Dillard argue that there is no reasonable basis for a claim of strict liability against Dillard in state court because she did not design or manufacture the DePuy prosthesis allegedly implanted in Spataro and New Mexico does not extend strict liability in medical products cases beyond those who design or manufacture the products.  *See **Defendants DePuy Orthopaedics, Inc. and Gina Dillard's Response to Plaintiff's Motion to Remand*** (*Doc. 12*) at pages 15-23.  Thus, DePuy and Dillard urge the Court to disregard the strict liability claims against Dillard, and her New Mexico citizenship, in determining whether complete diversity exists.  *Id.* at 23-24.

19.      New Mexico has adopted the principle of strict products liability based on the Restatement (Second) of Tort § 402A (1965).  *See Stang v. Hertz Corp.*, 83 N.M. 730, 497 P.2d 732 (1972).  In New Mexico, "[o]rdinarily, any entity engaged in the business of selling or otherwise distributing products is strictly liable for distributing a defective product."  *Parker v. St. Vincent Hospital*, 122 N.M. 39, 41, 919 P.2d 1104, 1106 (Ct. App. 1996) (citation omitted); *see also* New Mexico Uniform Civil Jury Instruction 13-1406 ("Under the 'products liability' claim, a supplier in the business of putting a product on the market is liable for harm proximately caused by an unreasonable risk of injury resulting from a condition of the product or from the manner of its use. Such a risk makes the product defective.  This rule applies even though all possible care has been used by the supplier in putting the product on the market.").[9]

---

[9]Under New Mexico law, a defendant can be strictly liable for a defective product without being a seller of the product. *See Arenivas v. Continental Oil Co.*, 102 N.M. 106, 108, 692 P.2d 31,33 (Ct. App. 1983) ("New Mexico law does not require [a] plaintiff to prove that defendant was a seller of the product to find strict liability under Restatement (Second) of Torts § 402A (1965) . . . . One can be held strictly liable if he is in the business of putting a product on the market."); *see also* New Mexico Uniform Civil Jury Instructions, Chapter 14, Introduction ("No definition of a 'supplier' is provided under UJI 13-1402.  The omission is intentional.  *Stang v. Hertz*, supra, suggests a wide scope of application for strict liability in tort and the law, with respect to persons liable under this theory, is in a state of development.").

20.     DePuy and Dillard contend that Dillard is not subject to strict liability because New Mexico does not extend strict liability in defective medical products cases beyond those who design or manufacture the products.   *See* ***Defendants DePuy Orthopaedics, Inc. and Gina Dillard's Response to Plaintiff's Motion to Remand*** (*Doc. 12*) at 17.   However, DePuy and Dillard have failed to carry their burden of showing that there is no possibility that Spataro could establish a strict liability cause of action against Dillard in state court.   *See Montano v. Allstate Indem.*, 2000 WL 525592 at *1-2.  DePuy and Dillard do not cite any New Mexico case holding that a sales representative for a medical device cannot be held strictly liable for defects in the device.

21.     A review of the principal cases cited by DePuy and Dillard does not change the Court's conclusion.  In *Parker v. St. Vincent Hospital*, 122 N.M. 39, 919 P.2d 1104 (Ct. App. 1996), relied on by DePuy and Dillard, the New Mexico Court of Appeals held that a hospital which supplied joint replacement devices ordered by a physician, and then billed for them at a mark-up, should be treated as a distributor of the devices for strict products liability purposes but, for public policy reasons, should not be treated the same as other distributors and should not be held strictly liable for any design defect in the devices.  *Id.* at 41-46, 1106-1111.  In determining whether the hospital could be held strictly liable, the court engaged in an extensive analysis of five policies supporting the imposition of strict products liability articulated by the New Mexico Supreme Court in *Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 902 P. 2d 54 (1995), a design defect products liability case.[10]  Having analyzed these policies, the court concluded that strict products liability was

---

[10]The five policies considered by the court in its analysis in *Brooks* were: (1) "placing the cost of injuries caused by *defective* products on the manufacturer who is in a better position to pass the true product cost on to all distributors, retailers, and consumers of the product;" (2) "relieving the injured plaintiff of the onerous burden of establishing the manufacturer's negligence;" (3) "providing full chain of supply protection;" (4) "in the interest of fairness, providing relief against the manufacturer who-while perhaps innocent of negligence-cast the defective product into the stream of commerce and profited thereby[;]" and (5) "caus[ing] manufacturers to take more care in designing

inappropriate. *Parker v. St. Vincent Hospital*, 122 N.M. at 45, 919 P.2d at 1110. The court acknowledged that its holding was a narrow one and was restricted "to the question [of] whether it is appropriate to impose strict products liability on hospitals with respect to a defectively designed medical product selected by the treating physician." *Id.*, 122 N.M. at 42, 919 P.2d at 1107.[11] The court did not decide whether a hospital could be subject to strict products liability for a defectively manufactured medical device and did not decide, or discuss, whether a sales representative for medical devices could be held strictly liable for product defects.

22.     In *Tanuz v. Carlberg*, 122 N.M. 113, 921 P.2d 309 (Ct. App. 1996), also relied on by DePuy and Dillard, the New Mexico Court of Appeals cited its public policy analysis in *Parker v. St. Vincent Hospital* as controlling and concluded that a physician could not be held strictly liable, as a matter of policy, for the use of a manufactured implant, selected by the physician, that was later shown to be defective. *Tanuz v. Carlberg*, 122 N.M. at 116, 120, 921 P.2d at 312, 316. In *Tanuz*, the court did not decide, or discuss, whether a sales representative for medical devices could be held strictly liable for product defects.

23.     While it is not entirely clear whether Spataro could establish a strict liability cause of action against Dillard in state court, this Court cannot conclude that there is no possibility of this.

---

and manufacturing a product and in the warnings they give to consumers about using that product." *Brooks v. Beech Aircraft Corp.,*, 120 N.M. at 377 and 376 n. 1, 902 P.2d at 58 n. 1 and 59 (quoted in *Parker v. St. Vincent Hospital*, 122 N.M. at 42, 919 P.2d at 1107.)

[11]The distinction between a defectively designed medical product claim and a defectively manufactured medical product claim could be significant to a New Mexico court. In *Parker v. St. Vincent Hospital*, the court noted a provision of <u>The Restatement (Third) of Torts: Products Liability § 8(e) (Tentative Draft No. 2, 1995)</u> stating that "retail sellers and other distributors of prescription drugs and medical devices are subject to liability only for manufacturing defects or their own negligence." *Parker v. St. Vincent Hospital*, 122 N.M. at 41, 46, 919 P.2d at 1106, 1111. This provision now appears in <u>The Restatement (Third) of Torts: Products Liability § 6(e) (1998)</u> which states: "A retail seller or other distributor of a prescription drug or medical device is subject to liability for harm caused by the drug or device if: (1) at the time of sale or other distribution the drug or medical device contains a manufacturing defect as defined in § 2(a); or (2) at or before the time of sale or other distribution of the drug or medical device the retail seller or other distributor fails to exercise reasonable care and such failure causes harm to persons."

This Court acknowledges that a New Mexico court, in the future, may decide that a sales representative like Dillard cannot be held strictly liable for a defective medical device. However, for this Court to decide that question, which New Mexico's appellate courts have not decided, on a motion to remand, would require that it engage in the multi-part policy analysis that the state courts utilized in deciding *Parker v. St. Vincent Hospital* and *Tanuz v. Carlberg*. This is exactly the sort of "intricate analysis of state law" that counsels a finding that Spataro's claims against Dillard are "not so wholly insubstantial and frivolous that [they] may be disregarded for purposes of diversity jurisdiction." *Batoff v. State Farm Ins. Co.*, 977 F.2d at 853 (quoted in *Montano v. Allstate Indem.*, 2000 WL 525592 at *2). Accordingly, the Court finds that DePuy and Dillard have failed to meet their burden of showing that Dillard is fraudulently joined in this action.

### Defendant Randy Arnold

24.    Spataro asserts two claims of strict products liability against Defendant Randy Arnold in Spataro's first amended complaint. *See* **Defendant's Notice of Filing State Court Record** (*Doc. 10*), Exhibit A (*Doc. 10-2*) at pages 13 and 14, ¶¶ 30-39. In his first claim, Spataro alleges that Arnold was an employee or independent contractor of DePuy who distributed and/or supplied DePuy medical devices. *Id.* at ¶ 31. Spataro alleges that the defective condition of the DePuy prosthesis, created by DePuy's failure to manufacture, inspect, market, package and/or distribute the prosthesis in accordance with FDA specifications and requirements, created an unreasonable risk of injury when the device was used for its intended purpose. *Id.* at ¶ 32. Spataro alleges that his injuries were caused by the defective condition of the DePuy prosthesis and that Arnold is strictly liable for Spataro's damages under the Restatement (Second) of Torts § 402A. *Id.* at ¶¶ 33-34. In his second claim, Spataro alleges that Arnold is strictly liable to Spataro for the allegedly defective

prosthesis under the doctrine of res ipsa loquitur.  *Id.* at ¶¶ 35-39.  Spataro alleges, upon information

and belief, that Arnold was present before, during and/or after his surgery in August of 2005, and

that Arnold and/or Dillard supplied the prosthesis to the operating surgeon.  *Id.* at ¶ 6.

      25.      In his sworn affidavit, Arnold states that he is not, and has never been, a distributor

or supplier of medical device products manufactured by DePuy, and that he is not, and has never

been, an independent contractor sales representative for such products.  *See **Notice of Removal***

(*Doc. 1*),  Exhibit C (*Doc. 1-5*) at ¶ 4.  He further states that he did not do any of the activities

described in Spataro's first amended complaint in connection with the knee prosthesis implanted in

Spataro during his August, 2005, surgery.  *Id.*  Although Arnold states that he was present during

at least portions of Spataro's surgery in August of 2005, Arnold states that his presence was solely

as an observer because he was then considering becoming an independent contractor sales

representative for medical device products manufactured by DePuy.  *Id.* at ¶ 5.  Arnold states that

he did not becomes a sales representative for DePuy products.  *Id.*

      26.      Gina Dillard's affidavit is consistent with the foregoing statements by Arnold in his

affidavit.  In her affidavit, Dillard states that if Arnold was present during any portions of surgery

on Spataro in August of 2005, he was present solely as an observer since he was then considering

becoming an independent contractor sales representative for DePuy medical device products.  *See*

***Notice of Removal*** (*Doc. 1*), Exhibit B (*Doc. 1-4*) at ¶ 7.  Dillard states that the delivery activities

described in her affidavit would have been the only activities for the DePuy knee prosthesis

implanted in Spataro's August, 2005, surgery and would only have been performed by an

independent contractor for DePuy.  *Id.*

27.     Although Spataro has alleged strict liability claims against Arnold in his first amended complaint, he has failed to contradict the statements in Arnold's and Dillard's affidavits cited in paragraphs 25 and 26, above, indicating that Arnold was never an independent contractor sales representative for DePuy products, or otherwise a supplier or distributor of medical device products manufactured by DePuy, and that he was present at DePuy's surgery in August of 2005, solely as an observer.  A plaintiff's failure to respond to an affidavit by a non-diverse defendant can support a finding that there is no reasonable basis in fact for pursuing a lawsuit against the non-diverse defendant.  *See Badon v. RJR Nabisco Inc.*, 224 F.3d 382, 393-94 (5th Cir. 2000) (court considered non-diverse defendants' affidavits in light of the plaintiff's lack of evidence); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, 220 F. Supp. 2d 414, 422 (E.D. Pa. 2002) (non-diverse physicians were fraudulently joined as to some plaintiffs when it was undisputed that they did not treat or have any contact with those plaintiffs); *Miller v. Home Depot, U.S.A., Inc.*, 199 F. Supp. 2d 502, 508 (W.D. La. 2001) (fraudulent joinder found when plaintiffs did not contest evidence that non-diverse defendants did not sell or manufacture any chemically treated wood acquired by named plaintiffs); *In re Rezulin Products Liability Litigation*, 133 F. Supp. 2d 272, 281 (S.D. N.Y. 2001) (fraudulent joinder found when plaintiffs failed to respond to sales representatives' affidavits and court concluded that joinder of sales representatives lacked any reasonable basis in fact).  *See also Lobato v. Pay Less Drug Stores, Inc.*, 261 F. 2d 406, 409 (10th Cir. 1958) (defendants were fraudulently joined when it was undisputed that they had no personal involvement in the assembly and sale of an allegedly defective bicycle).

28.     Here, the Court finds there is positive and uncontradicted evidence, in the sworn statements in Defendant Arnold's affidavit, that he has never been an independent contractor sales representative for DePuy medical device products, or otherwise acted as a supplier or distributor of medical device products manufactured by DePuy; that he did not do any of the activities described in Spataro's first amended complaint in connection with the prosthesis implanted in Spataro during his August, 2005, surgery, other than attend Spataro's surgery; and that Arnold was present at Spataro's surgery solely as an observer.  On the basis of these undisputed facts, the Court finds there is no possibility that Spataro could establish a strict liability cause of action against Arnold in state court on the ground that he is, or was, "engaged in the business of selling or otherwise distributing" defective medical device products manufactured by DePuy.  *Parker v. St. Vincent Hospital*, 122 N.M. at 41, 919 P.2d at 1106 (citations omitted).  Joinder may be fraudulent if there is no factual basis for a cause of action.  *See Dodd v. Fawcett Publications, Inc.*, 329 F. 2d at 85 ("The joinder of a resident defendant against whom no cause of action is stated is patent sham, . . . *and though a cause of action be stated, the joinder is similarly fraudulent if in fact no cause of action exists*.") (citations omitted) (emphasis added).  Thus, the Court finds that DePuy and Dillard have met their burden of showing that Arnold is fraudulently joined in this action.

### *Amount in Controversy*

29.     Diversity jurisdiction under 28 U.S.C. § 1332(a) requires an amount in controversy that "exceeds the sum or value of $75,000, exclusive of interest and costs[.]"  In his motion to remand, Spataro contends that "Defendants have established an insufficient record to prove the requisite amount in controversy."  ***Plaintiff's Motion to Remand*** (*Doc. 5*) at 1.  In their response to the motion, Defendants DePuy and Dillard argue that "[t]he amount in controversy patently

exceeds $75,000." ***Defendants DePuy Orthopaedics, Inc. and Gina Dillard's Response to Plaintiff's Motion to Remand*** (*Doc. 12*) at 1.

30.     In this case, Spataro has not alleged a specific amount in controversy in the prayer for relief in his first amended complaint. *See* ***Defendant's Notice of Filing State Court Record*** (*Doc. 10*), Exhibit A (*Doc. 10-2*) at page 15.  Instead, Spataro simply "requests judgment for compensatory damages against DePuy, Arnold and Gina [Dillard] in amounts to be determined at trial, costs, pre- and post-judgment interest, and such other relief as is permitted by law." *Id.*

31.     The Tenth Circuit Court of Appeals recently clarified its standard for determining the sufficiency of the amount in controversy for purposes of diversity jurisdiction.  In *McPhail v. Deere & Co.*, 529 F.3d 947 (10th Cir. 2008), a case like this one which involved a motion to remand for failing to establish the requisite amount in controversy for diversity jurisdiction and a complaint that was silent on the amount of plaintiff's claims, the court adopted a Seventh Circuit standard for determining the sufficiency of the amount in controversy.  That standard, explained by the Seventh Circuit in *Meridian Security Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006), is as follows:

> [A] proponent of federal jurisdiction must, if material factual allegations are contested, prove those jurisdictional facts by a preponderance of the evidence.  Once the facts have been established, uncertainty about whether the plaintiff can prove its substantive claim, and whether damages (if the plaintiff prevails on the merits) will exceed the threshold, does not justify dismissal. . . . Only if it is 'legally certain' that the recovery (from plaintiff's perspective) or cost of complying with the judgment (from defendant's) will be less than the jurisdictional floor may the case be dismissed.

32.     In *McPhail v. Deere & Co.*, 529 F.3d at 954, the Tenth Circuit also cited, with

seeming approval, the following approach to establishing the amount in controversy articulated by

the Ninth Circuit in *Meridian Security Ins. Co. v. Sadowski*:

> [T]he removing defendant, as proponent of federal jurisdiction, must
> establish what the plaintiff stands to recover.  We have suggested
> several ways in which this may be done-by contentions
> interrogatories or admissions in state court; by calculation from the
> complaint's []; allegations[]; by reference to the plaintiff's informal
> estimates or settlement demands[]; or by introducing evidence, in the
> form of affidavits from the defendant's employees or experts, about
> how much it would cost to satisfy the plaintiff's demands[].  The list
> is not exclusive; any given proponent of federal jurisdiction may find
> a better way to establish what the controversy between the parties
> amounts to, and this demonstration may be made from either side's
> viewpoint (what a judgment would be worth to the plaintiff, or what
> compliance with an injunction would cost the defendant). . . . Once
> the estimate has been made-and contested factual allegations that
> support the estimate have been established in a hearing under Rule
> 12(b)(1) by admissible evidence (that's what 'competent' proof
> means)-then the *St. Paul Mercury* standard comes to the fore, and the
> case stays in federal court unless it is legally certain that the
> controversy is worth less than the jurisdictional minimum.

*Id.* at 541-42 (citations omitted).[12]

33.     Reviewing the record, the Court finds that Defendants DePuy and Dillard have

proved, by a preponderance of the evidence, facts necessary to support their contention that this case

may involve more than $75,000.

34.      In his first amended complaint, Spataro alleges that DePuy's wrongful acts have

proximately caused him damages which include, but are not limited to, damages for "physical injury

and past and future pain and suffering, emotional distress, mental anguish, loss of enjoyment of life,

---

[12]The reference to "*St. Paul Mercury*" is a reference to *St. Paul Mercury Indem. Co. v. Red Cab Co.*,
303 U.S. 283, 288-89 (1938) holding that "[i]t must appear to a legal certainty that the claim is really for less than the
jurisdictional amount to justify dismissal."

and impaired earning capacity." ***Defendant's Notice of Filing State Court Record*** (*Doc. 10*),

Exhibit A (*Doc. 10-2*) at page 11.  Additionally, Spataro alleges that he "has required and will

continue to require medical services" as a proximate result of DePuy's wrongful acts.  *Id.*

35.   A settlement demand from Spataro's attorney, contained in a letter to Betsy Spiegel

of DePuy dated July 12, 2007, provides more detailed information about Spataro's damage claim.

*See* ***Notice of Removal*** (*Doc. 1*), Exhibit E (*Doc. 1-7*) at pages 1-3.  This letter states that Spataro's

"life has permanently changed for the worse" because of the alleged failure of the DePuy prosthesis.

*Id.* at 1.  The letter states that it took about one year for Spataro's physician to discover the

prosthesis had failed and during that time Spataro "had excruciating pain, could not sleep at night

or walk for any length of time and could not rise from a sitting position without an intense pain

surge." *Id.*  The letter states that Spataro underwent two in-hospital surgical procedures to diagnose

and try to convert the failure of the prosthesis but he was left with limited flexion, difficulty walking

up and down stairs, limping when walking, balance problems, weakness in his leg, severe pain from

keeping his knee flexed more than five minutes at a time, a need to stand up frequently from a sitting

position even though getting up from a chair causes increased pain, frequent knee swelling,

difficulty walking downhill, difficulty sleeping due to pain, and knee pain after any exertion.  *Id.* at

1-2.  The letter further states that Spataro, who is a teacher, was forced to give up his job coaching

high school track and field and he feels that he is going to have to retire soon because of his knee.

*Id.* at 2.  The letter states that Spataro has gained about forty pounds since his original surgery, due

to decreased activity, and that increased activity to reduce his weight is not an option.  *Id.*  The letter

states that the cost of the two surgical procedures to discover and correct the failed prosthesis was

about $50,000, exclusive of the cost of post-operative equipment and medications, and that the

diagnosis and reparation surgeries have caused him to lose about $6,000 in salary and leave days. *Id.* Additionally, the letter states that Spataro's "economic losses are not the most important losses - the losses in quality of life are." *Id.* Finally, the letter states that Spataro's physician has indicated that his condition is permanent, as the result of "tremendous scarring resulting from the migration of the plastic component of the prosthesis," and that Spataro may need further orthopedic follow-up and physical therapy. *Id.* Although the total amount required to settle the case is redacted in the demand letter, Spataro admits, in the memorandum in support of his motion to remand, that the letter demanded more than $75,000 to settle the case. *See **Memorandum in Support of Plaintiff's Motion to Remand** (Doc. 6)* at 12.

36.     This letter from Spataro's attorney establishes an estimated damage claim of $56,000, just for Spataro's two additional surgical procedures to discover and correct the allegedly failed prosthesis and for his lost salary and leave days.  The combined value of his damages for pain and suffering, emotional distress, mental anguish, loss of enjoyment of life, impaired earning capacity, and future medical care is in addition to this amount.  The Court agrees with Defendants that the allegations in Spataro' s first amended complaint, the contents of his attorney's demand letter and his attorney's admission that the demand letter sought more than $75,000 to settle the case are relevant and, together, support a finding that the total estimated amount of Spataro's potential damages may exceed $75,000. *See Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 298 (5th Cir. 1999) (court estimated potential damages from allegations in complaint by "[r]eading the face of the complaint," although it did "not specify the numerical value of the damage claim."); *McPhail v. Deere & Co.*, 529 F.3d at 957 ("documents that demonstrate plaintiff's own estimation of its claim are a proper means of supporting the allegations in the notice of removal, even though

they cannot be used to support the ultimate amount of liability"); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002) (holding that a settlement letter was relevant evidence of the amount in controversy if it appeared to be a reasonable estimate of the plaintiff's claim).

37.    The Court also takes into account, in its consideration of the amount in controversy, a letter from defense counsel to Spataro's attorney dated March 13, 2008, the authenticity and content of which are not in dispute.  *See **Notice of Removal** (Doc. 1)*, Exhibit F (*Doc. 1-8*).  In this letter, defense counsel confirms a telephone conversation between the attorneys during which Spataro's attorney did not agree to stipulate that his client's claimed damages in this action, exclusive of interest and costs, totaled less than $75,000.  *Id.*  This letter, which suggests that Spataro's attorney believed his client's damages were in excess of $75,000, also supports a finding that the amount in controversy requirement is met.  *See Hanna v. Miller*, 163 F. Supp. 2d 1302, 1306 (D.N.M. 2001) (Kelly, J., sitting by designation) (noting that when a complaint is silent regarding the amount of damages sought, courts may consider "a plaintiff's refusal to stipulate or admit that he or she is *not* seeking damages in excess of the requisite amount.").

38.    Based on the allegations in the first amended complaint and the information contained in the correspondence between Spataro's attorney and defense counsel referenced above, the Court finds that DePuy and Dillard have met their burden of establishing that the value of Spataro's claims may exceed $75,000.  Moreover, the Court concludes that is it not legally certain that Spataro could recover an amount less than $75,000 on his claims.  Consequently, the Court concludes that the amount in controversy requirement for diversity jurisdiction is met in this case.

*Conclusion*

39.     For the reasons set forth above, the Court concludes that there has been no fraudulent joinder of Defendant Gina Dillard in this action.  The Court further concludes that Defendant Randy Arnold has been fraudulently joined and that Defendants DePuy and Dillard have proved facts establishing that the amount in controversy requirement is met for diversity jurisdiction. Because Gina Dillard's presence as a defendant destroys complete diversity and, therefore, deprives the Court of diversity jurisdiction, the Court recommends that ***Plaintiff's Motion to Remand*** (*Doc. 5*) be **GRANTED** and this case be remanded to the Second Judicial District Court of Bernalillo County, New Mexico.

## <u>RECOMMENDED DISPOSITION</u>

The Court recommends that ***Plaintiff's Motion to Remand*** (*Doc. 5*) be **GRANTED** and this case be remanded to the Second Judicial District Court of Bernalillo County, New Mexico.


*Lourdes a. Martínez*
**LOURDES A. MARTÍNEZ**
**United States Magistrate Judge**